**TELECTRONICS PACING SYSTEMS, INC., Plaintiff–Appellant,**

v.

**VENTRITEX, INC., Defendant–Appellee.**

91–1289.

United States Court of Appeals, Federal Circuit.

Dec. 21, 1992.

Michael I. Rackman, Gottlieb, Rackman & Reisman, P.C., New York City, argued for plaintiff-appellant. With him on the brief were William C. Nealon, Suffield, CT and William H.G. Norman, Bronson, Bronson & McKinnon, San Francisco, CA, of counsel.

George H. Gerstman, Gerstman & Ellis, Ltd., Chicago, IL, argued for defendant-appellee. With him on the brief were Denis R. Salmon and Madison Jellins, Brobeck, Phileger & Harrison, Palo Alto, CA, of counsel.

RICH, MICHEL and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

In this case, plaintiff Telectronics charged defendant Ventritex with patent infringement, alleging that Ventritex had engaged in activities that were not exempt under 35 U.S.C. § 271(e)(1) (1988) as activities "solely for uses reasonably related" to obtaining FDA approval of its implantable defibrillator. In addition, plaintiff sought a declaratory judgment that, upon FDA approval, sales of Ventritex's device would infringe Telectronics' patents. Defendant moved to dismiss the action. The United States District Court for the Northern District of California converted the motion to dismiss to a motion for summary judgment, and granted summary judgment to defendant Ventritex. Telectronics appealed the district court's judgment pursuant to 28 U.S.C. § 1295(a) (1988). We *affirm*.

## I. FACTUAL BACKGROUND

The basic facts are undisputed. Pursuant to an Investigational Device Exemption (IDE) from the Food and Drug Administration (FDA), Ventritex began conducting clinical trials of its implantable defibrillator in July of 1989. The IDE allowed Ventritex to sell its device, at cost, for implantation in patients in order to obtain data on the device's clinical operation. *See* 21 C.F.R. part 812 (1989). This data is required by the FDA for securing pre-market approval of the device. *Id.* part 814.

Ventritex displayed its defibrillator at seven medical conferences, at which the device was demonstrated to physicians and to some non-physicians. Some of Ventritex's clinical investigators also submitted an abstract to the American College of Cardiology and presented results of the clinical trial at the conference.

In his fund-raising efforts as President and CEO of Ventritex, Frank M. Fischer described the on-going clinical trial to investors, analysts and journalists. Specifically, Fischer compared Ventritex's defibrillator to those of other companies, reported on the number of implants and the number of centers doing these implants, and distributed a handout which stated that "Early clinical results are quite promising."

Ventritex also mailed a Private Placement Memorandum to potential investors along with a cover letter and a research note from an investment banking firm, both of which described the size and progress of the clinical trial. The funds raised were to be used, among other purposes, for continuing the clinical trials and for manufacturing equipment.

## II. PROCEDURAL HISTORY

On October 4, 1989 plaintiff Telectronics filed a complaint seeking five counts of declaratory judgment that defendant Ventritex's activities in making, using, or selling its implantable defibrillator would infringe plaintiff's patents[1] upon expiration of the clinical testing exemption under 35 U.S.C. § 271(e)(1). On October 25, 1989 Ventritex moved to dismiss the complaint for failure to state a claim upon which relief could be granted, and because the complaint sought an advisory opinion.

Telectronics amended its complaint on November 14, 1989 to include five additional counts of patent infringement, alleging that defendant had engaged in activities that were not exempt under 35 U.S.C. § 271(e)(1) as activities solely for uses reasonably related to obtaining FDA approval of the device. Ventritex again moved to dismiss on December 11, 1989, on the grounds that the declaratory judgment counts sought an advisory opinion, and that all counts failed to state a claim upon which relief could be granted.

On December 20, 1990 the district court ordered that defendant's motion to dismiss be converted to a motion for summary judgment. On February 4, 1991 the court entered a brief order granting the defendant's motion for summary judgment. The judge stated that he was unpersuaded by plaintiff's arguments and agreed with defendant that its activities were exempt under § 271(e)(1).

On appeal to us, Telectronics claims that the district court erred by (1) exempting under § 271(e)(1) acts which had nothing to do with the clinical trials; (2) sustaining a

clinical trial exemption when the data gathered from the clinical trials were used for commercial purposes totally unrelated to FDA reporting; and (3) refusing to hear the declaratory judgment counts when there was an actual controversy. Telectronics further claims that the district court's judgment must be vacated because it states no reasons for the decision on the declaratory judgment counts. Ventritex's position is that the district court's judgment was proper.

## III. SCOPE OF REVIEW

Summary judgment is properly granted only where there is no genuine issue of material fact and the prevailing party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. All evidence must be viewed in a light most favorable to the non-moving party, and all reasonable inferences must be drawn in favor of the non-moving party. *Armco, Inc. v. Cyclops Corp.*, 791 F.2d 147, 149, 229 USPQ 721, 723 (Fed.Cir. 1986). We review the grant of summary judgment *de novo* to determine whether the above standards for summary judgment have been met. *Winner Int'l Corp. v. Wolo Mfg. Corp.*, 905 F.2d 375, 376, 15 USPQ2d 1076, 1077 (Fed.Cir.1990); *Armco*, 791 F.2d at 149, 229 USPQ at 723.

## IV. DISCUSSION

The basic facts are undisputed. What remains to be determined is whether defendant Ventritex was entitled to judgment as a matter of law. The issues before us are: (1) were Ventritex's activities exempt under 35 U.S.C. § 271(e)(1) from charges of infringement, and (2) did the district court judge abuse his discretion in refusing to hear the declaratory judgment counts regarding future infringement?

### A.

Appellant Telectronics charges that Ventritex's demonstrations of the defibrillator to non-physicians at medical conferences are non-exempt activities because these demonstrations were not solely for uses

---

1. U.S. Patents No. 4,390,021, 4,488,553, 4,488,- 554, 4,398,536 and 4,408,606.

reasonably related to FDA approval. Appellee Ventritex responds that demonstrating the device at medical conferences was necessary to obtain clinical investigators for its trials.

Telectronics also argues that Ventritex's other making, using and selling activities, even if originally performed for clinical trial purposes and thus exempt, have now 'lost' their exemption because the clinical trial data was later disseminated to non-physicians for purposes unrelated to FDA reporting requirements. Ventritex answers that the language of § 271(e)(1) concerns only the making, using or selling of a patented invention, and does not deal with activities, such as collateral use of data, which in any other context would be non-infringing. Ventritex notes that none of its defibrillators has been sold or implanted other than under the control of a clinical investigator, and that the FDA, which has its own procedures for controlling the use and sale of investigational devices during clinical trials, has never complained about Ventritex's practices.

We begin our analysis of 35 U.S.C. § 271 with the language of the statute:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

.   .   .   .   .

(e)(1) It shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

1.

▮ The language of § 271(a) clearly specifies only the making, using or selling of a patented invention as infringing activities. Under § 271(e)(1), these potentially

infringing activities are exempt if performed solely for uses reasonably related to the development of information for FDA approval. The only making, using or selling activity that Telectronics specifically alleges as unrelated to FDA approval is Ventritex's demonstration of its defibrillator to some non-physicians at medical conferences. Ventritex responds that its "demonstrations have all been set up for the purpose of obtaining clinical investigators." Appellee's Br. at 31. Absent some showing that Ventritex's purpose is disputed, *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1363, 21 USPQ2d 1276, 1281 (Fed.Cir. 1991) (when a sufficiently supported motion for summary judgment is submitted, burden of showing a genuine issue of material fact shifts to nonmovant), such demonstrations constitute an exempt use reasonably related to FDA approval, because device sponsors are responsible for selecting qualified investigators and providing them with the necessary information to conduct clinical testing. 21 C.F.R. § 812.40 (1989). The fact that some non-physicians may have seen the device at the conferences is merely incidental and of minimal import, since only physicians can implant the device. Observation of the device at medical conferences by non-physicians does not impair the conclusion that such uses satisfy the requirements of § 271(e)(1). During oral argument, Telectronics admitted that the demonstrations were not a sale or an offer to sell. We note that the FDA has its own requirements that prohibit sponsors of medical devices from promoting, test marketing or commercializing [2] investigational devices. 21 C.F.R. § 812.7 (1989).

2.

▮ All of the other Ventritex activities that Telectronics complains of—presenting clinical trial data at a cardiology conference, reporting clinical trial progress to investors, analysts and journalists, and describing clinical trial results in a private fund-raising memorandum—fall under the

---

**2.** "Commercializing" a device means charging the subjects or investigators more than the costs of manufacturing, researching, developing, and

handling the device. 21 C.F.R. § 812.7(b) (1989).

category of dissemination of the data developed for FDA approval. The statute does not identify dissemination of this information as a potentially infringing activity; Telectronics concedes that this disclosure of clinical trial data cannot, in and of itself, constitute an infringing activity. *See Eli Lilly and Co. v. Medtronic, Inc.*, 915 F.2d 670, 673, 16 USPQ2d 2020, 2023 (Fed.Cir. 1990). Its case here is based on the theory that the statute requires that the original exemption of the making, using and selling activities be revoked when the resulting data is later used for non-FDA reporting purposes.

We do not read the statute as implying any such limitation. In the first place, if the language is clear, the plain meaning of the statute will be regarded as conclusive. *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1579, 16 USPQ2d 1614, 1618 (Fed.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991); *see Sullivan v. Stroop*, 496 U.S. 478, 482, 110 S.Ct. 2499, 2502, 110 L.Ed.2d 438 (1990); *see K-mart Corp. v. Cartier, Inc.* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). While legislative history may aid our understanding of the function and purposes of the statute, and in cases of doubt assist in interpretation of the language, when the legislature has clearly spoken the law, the court's duty is to enforce it as written. *See VE Holding*, 917 F.2d at 1580, 16 USPQ2d at 1618. The statute at issue here only requires that the making, using or selling of the patented invention be solely for uses reasonably related to FDA approval. To adopt Telectronics' interpretation we would have to read into this statute an unspoken requirement that the disclosure of information obtained during clinical trials to persons other than FDA officials, although not itself an act of infringement, somehow 'repeals' the exemption. We do not find that requirement in the words of the statute.

In the second place, the history of the statute does not support such a reading.

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984), addressed two distinct problems created by the legal requirements for premarket FDA approval of drugs and medical devices, and the lengthy delays often attendant on this approval. For products utilizing patented inventions, the approval process created problems at both ends of the patent term.

At the front end, a patent owner's effective patent term was shortened by the time spent obtaining approval, because a medical product using the patented invention could not be marketed without FDA approval. H.R.Rep. No. 98–857(I), 98th Cong., 2d Sess. 15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2648; *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 669, 110 S.Ct. 2683, 2688, 110 L.Ed.2d 605 (1990). In 1984, when the amendment was added, the approval process was taking an average of seven to ten years from the time the patent was issued.[3] The product thus could be unmarketable for a substantial part of the life of the patent. To avoid this unintended distortion of the purposes of the Patent Act, Congress provided for extending the patent term of patents related to certain products that could not be marketed before undergoing a lengthy regulatory approval process. 35 U.S.C. § 156; *Eli Lilly*, 496 U.S. at 670, 110 S.Ct. at 2688.

At the other end, the delay attendant on obtaining FDA approval for a competing product that utilized the patented invention had the effect in some situations of extending the patentee's exclusive rights beyond the patent term. H.R.Rep. No. 98–857(I), 98th Cong., 2d Sess. 46 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2679; *Eli Lilly*, 496 U.S. at 670, 110 S.Ct. at 2688. Since a competing product utilizing the invention could not be made or used while the patent was still in effect without infringing, *Roche Products Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 221 USPQ 937 (Fed.Cir. 1984), *cert. denied,* 469 U.S. 856, 105 S.Ct.

---

3. *Innovation and Patent Law Reform: Hearings on H.R. 3285, H.R. 3286, and H.R. 3605 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House of Repre-* *sentatives Comm. on the Judiciary,* 98th Cong., 2d Sess. 409 (1984) (statement of Lewis A. Engman, President, Pharmaceutical Manufacturers Association).

183, 83 L.Ed.2d 117 (1984) (under the statutes then in effect, the use of a patented invention without permission was an infringing use even if the use were limited to tests necessary to obtain FDA approval), the process of obtaining FDA approval for the competing product could not be undertaken until the original patent expired. As a practical matter there would be no competing products, such as generic versions of a brand name drug, on the market until long after the patent on the original invention had expired.

To avoid this second unintended distortion, Congress enacted 21 U.S.C. § 355(j), which provided expedited approval for generic drugs through abbreviated new drug applications, and 35 U.S.C. § 271(e), the section at issue here. One effect of § 271(e) was to make the rule of *Roche Products* no longer operative. As a result of the 1984 amendment, a competitor who anticipates coming into the marketplace with a product that utilizes a currently patented invention may make, use and sell that product so long as it is "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs." 35 U.S.C. § 271(e)(1). The Supreme Court has held that this provision applies to medical devices which are subject to FDA approval, such as the one involved here, as well as to drugs. *Eli Lilly,* 496 U.S. at 673–74, 110 S.Ct. at 2690.

It would strain credulity to imagine that Congress was indifferent to the economics of developing and marketing drugs and medical devices when it enacted § 271(e)(1). The legislative history of the 1984 amendments attests to the costs, and rewards, of success in this highly competitive market.[4] Congress could not have been unaware of the need of competitors to raise funds for developing and testing competing products, and for preparing to enter the market once

controlling patents had expired. Since the approval of generic drugs is expedited through abbreviated new drug applications, while there is no comparable expedited process for medical devices, it would appear that manufacturers of competing medical devices have an even greater need for such fund raising than do generic drug companies. By permitting the testing and regulatory approval process to begin well before a controlling patent had run its course, Congress must have intended to allow competitors to be in a position to market their products as soon as it was legally permissible. As the House of Representatives Committee on Energy and Commerce stated, "the Constitution empowers Congress to grant exclusive rights to an inventor for a limited time. That limited time should be a definite time and, thereafter, immediate competition should be encouraged." H.R.Rep. No. 98–857(I), 98th Cong., 2d Sess. 46 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2679. If Congress intended to make that more difficult, if not impossible, by preventing competitors from using, in an admittedly non-infringing manner, the derived test data for fund raising and other business purposes, it would have made that intent clear. The statute contains no such provision.[5]

Since Ventritex's alleged activities of making, using and selling of the patented invention were conducted pursuant to the IDE, and were solely for uses reasonably related to clinical trial purposes, they were exempt under § 271(e)(1) from charges of infringement. Ventritex thus was entitled to summary judgment as a matter of law.

### B.

Regarding the issue of declaratory judgment, Telectronics argues that the district court's judgment must be vacated because it is " 'ambiguous or inascertainable' with respect to the reasons for entering sum-

---

4. *See, e.g., Drug Legislation: Hearings on H.R. 1554, H.R. 3605, H.R. 1055 and H.R. 1097 Before the Subcomm. on Health and the Environment of the House of Representatives Comm. on Energy and Commerce,* 98th Cong., 1st Sess. 127–133 (1983) (statement of the Pharmaceutical Manufacturers Association).

5. For a carefully reasoned and exhaustive analysis of this point, arriving at the same conclusion, see the opinion of Magistrate Wayne D. Brazil in *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269 (N.D.Cal.1991).

mary judgment" on the declaratory judgment counts. Appellant's Brief at 20. Telectronics argues that a justiciable controversy existed because Ventritex's device was being used clinically and was unlikely to be modified further before FDA approval. It points to testimony of Ventritex employees stating that no functional changes were anticipated if no reason to modify the device was uncovered during clinical trials.

Ventritex counters that the district court's judgment was proper, because the court need not explicitly state its reasons if they were self-evident from the face of the record, or if the issues are uncomplicated and the reviewing court can determine the correctness of the trial court's decision by reviewing the record presented by the parties. Ventritex claims that the basis for the district court's decision was obviously lack of a justiciable controversy. It argues that the future infringement issue was not ripe for adjudication because (1) its device may never be approved, and (2) even if approved, it may not be approved in its current state, because it is not uncommon for devices to be modified during the course of clinical testing.

As this court noted in *Lang v. Pacific Marine and Supply Co., Ltd.*, 895 F.2d 761, 13 USPQ2d 1820 (Fed.Cir.1990), while declaratory judgment actions in the patent area are most commonly brought by potential infringers who seek a declaration of noninfringement or invalidity, "[d]eclarations of infringement sought by patentees against parties who will allegedly infringe in the future have been less frequently requested, but have nevertheless been allowed to proceed. [Citations omitted.]" *Id.* at 763, 13 USPQ2d at 1821.

The court quoted *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735, 6 USPQ2d 1685, 1688 (Fed.Cir.1988), for the proposition that "[t]he sole requirement for jurisdiction under the [Declaratory Judgment] Act is that the conflict be real and immediate, *i.e.*, that there be a true, actual 'controversy' required by the Act." *Lang*, 895 F.2d at 764, 13 USPQ2d at 1821. The court opined that "[i]f the controversy requirement is met by a sufficient allegation of immediacy and reality, we see no reason why a patentee should be unable to seek a declaration of infringement against a future infringer when a future infringer is able to maintain a declaratory judgment action for noninfringement under the same circumstances." *Id.* at 764, 13 USPQ2d at 1822.[6]

However, when there is no actual controversy, the district court has no jurisdiction to hear the action. *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634, 19 USPQ2d 1545, 1547 (Fed.Cir.1991), *cert. denied*, 112 S.Ct. 658 (1991). Even assuming an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary. *Spectronics*, 940 F.2d at 634, 19 USPQ2d at 1547; *Minnesota Mining and Mfg. Co. v. Norton Co.*, 929 F.2d 670, 672, 18 USPQ2d 1302, 1304 (Fed.Cir.1991); *see Public Serv. Commission v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952); *see Intermedics Infusaid, Inc. v. Regents of University of Minnesota*, 804 F.2d 129, 135, 231 USPQ 653, 658 (Fed.Cir.1986).

While certainly preferable from the viewpoint of a reviewing court, the trial court does not have to explicitly set forth findings and conclusions to support its decision on summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); see *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1020–21, 226 USPQ 881, 883 (Fed.Cir.1985). But if the "district court's 'underlying holdings would otherwise be ambiguous or inascertainable,' the reasons for entering summary judgment must be stated somewhere in the record. *Hanson v. Aetna Life & Casualty*, 625 F.2d 573, 575 (5th Cir.1980). Federal Rule of Civil Procedure

---

**6.** A count under the Declaratory Judgment Act should be distinguished from a count under 35 U.S.C. § 271 for patent infringement. As the court in *Lang* noted, "That statute, by itself, cannot be interpreted to cover acts other than an actual making, using or selling of the patented invention." *Id.* at 765, 13 USPQ2d at 1823.

52(a) does not relieve the trial court of this burden." *Van Bourg, Allen, Weinberg & Roger v. National Labor Relations Board,* 656 F.2d 1356, 1357 (9th Cir.1981).

We thus evaluate the trial court's decision in the context of the facts as they existed when the complaint was filed in 1989. Telectronics must have shown "sufficient allegation of immediacy and reality" at that time to meet the actual controversy requirement for a declaratory judgment suit. *Lang,* 895 F.2d at 764, 13 USPQ2d at 1822; *see Spectronics,* 940 F.2d at 634–35, 19 USPQ2d at 1548. At the commencement of the suit, Ventritex's device had only recently begun clinical trials, and was years away from potential FDA approval. Ventritex was prohibited by FDA regulations from distributing sales literature and soliciting orders. 21 C.F.R. § 812.7 (1989). There was no certainty that the device when approved would be the same device that began clinical trials; product changes during testing are contemplated by statute, 21 U.S.C. § 360j(g)(2)(C)(iii) (1988), and Ventritex in fact did modify its device during clinical trials, Appellee's Br. at 48. Thus the district court could have correctly ruled that the case lacked sufficient immediacy and reality to meet the actual controversy requirement under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), and that it had no jurisdiction to hear the declaratory judgment count.

Even assuming the district court believed that an actual controversy existed, the district court's decision could have been an exercise of its discretion not to decide the declaratory issues at this preliminary stage. Such a decision is within the court's discretion unless (1) it was clearly unreasonable, arbitrary or fanciful, (2) it was based on an erroneous conclusion of law, (3) the court's findings were clearly erroneous, or (4) the record contains no evidence upon which the court rationally could have based its decision. *Minnesota Mining and Mfg.,* 929 F.2d at 673, 18 USPQ2d at 1305. On the facts of this case, we do not find any abuse of discretion.

As noted, it would have been preferable for the district court to have made specific findings and conclusions on which an appeal could be made and decided. Since the denial of the declaratory judgment action, based as it was on 1989 facts, does not preclude a later suit for declaratory judgment based on later events, or for a suit for actual infringement, we conclude that a remand for further clarification, as suggested by Telectronics, is not necessary or useful at this point. We therefore affirm the district court's judgment.

*AFFIRMED.*