**NeoRX CORP., Plaintiff,**

v.

**IMMUNOMEDICS, INC., Defendant.**

**Civ. No. 92–2853 (HLS).**

United States District Court,
D. New Jersey.

March 31, 1994.

Steven L. Lapidus, Robinson, St. John & Wayne, Newark, NJ, Carroll E. Neesemann, Vicki E. Baer, Morrison & Foerster, New York City, for plaintiff.

John J. Francis, Jr., Shanley & Fisher, Morristown, NJ, Robert L. Baechtold, Thomas H. Beck, Fitzpatrick, Cella, Harper & Scinto, New York City, for defendant.

## OPINION

SAROKIN, District Judge.

Before the court is defendant's motion for summary judgment and plaintiff's motion for declaratory judgment.

*Background*

Defendant Immunomedics, Inc. ["Immunomedics"] is a biopharmaceutical company whose primary focus is to develop products for the detection or "imaging" of cancer and infectious diseases, and the treatment of cancer.

Plaintiff NeoRx, Corp. ["NeoRx"] holds a United States patent, No. 4,877,868 ["the '868 patent"], for processes and resultant products for labelling proteins, such as antibodies, with radioactive metal isotopes to detect and treat cancer. The patent was issued on October 31, 1989 and will expire on October 31, 2006. NeoRx argues that Immunomedics is violating its patent by using the '868 patent's labeling process to make four of eight new products ["Products"].[1]

The Products use highly specific antibodies or antibody fragments to deliver radioactive labels to the tumors or sites of infection. Immunomedics is in the process of seeking U.S. Food and Drug Administration ["FDA"] approval of these Products—a license is a prerequisite to commercial manufacture or sale of any new substance in the United States. Obtaining a product license from the FDA is a complex process which requires preclinical studies, an Investigational New Drug ["IND"] application, human clinical trials divided into three phases, and for the manufacturing facilities, a Product License Application ["PLA"], as well as an Establishment License Application ["ELA"].

By October 1989, Immunomedics had filed two IND applications with the FDA concerning the Products. Since October 1989, Immunomedics has filed seven additional IND applications relating to several of the Products.

In April 1991, after completing all three phases of clinical testing, Immunomedics filed its first PLA with the FDA, requesting a license to produce and market one of the eight Products, ImmuRAID–CEA, for imaging colorectal cancer. The other seven remaining Products accused of infringement are still in the testing stage which precedes the filing of a PLA application.

Immunomedics has also filed applications for marketing approval for ImmuRAID–CEA and for clinical testing for several additional imaging or therapy products in various foreign countries.

On July 8, 1991, NeoRx filed this complaint in the Western District of Washington claiming patent infringement and breach of contract. On March 4, 1992, the Honorable Barbara J. Rothstein transferred the matter to the District of New Jersey.

On January 27, 1993, Immunomedics filed a motion for summary judgment, claiming that its activities regarding the Products were covered under an exemption in the patent laws for activities related to FDA filings for a new drug. 35 U.S.C. § 271(e)(1).

In an order entered on April 5, 1993, this court ordered that discovery be conducted within 90 days to determine whether Immunomedics activities are exempt under Section 271(e)(1). On July 19, 1993, Immunomedics renoticed its motion for summary judgment on the same ground.[2]

*Discussion*

### I. *Immunomedics' Summary Judgment Motion*

This court can only grant summary judgment if there are no issues of material fact and, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns–Manville,* 812 F.2d 81, 83 (3d Cir.1987). Notwithstanding this presumption in favor of the non-moving party, in opposing a motion for summary judgment, a party

must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule,

---

1. The eight accused products are called Immu-RAID–CEA, ImmuRAID–MN3, ImmuRAID–AFP, ImmuRAID–LL2, ImmuRAID–HCG, ImmuRAIT–Rhenium, ImmuRAIT–LL2 and ImmuRAIT–CEA.

2. As a result of the months-long lapse of time in between the original filing and the reviving of this motion, the parties have submitted a second set of motion papers. Hence, the court will refer to each set by the Roman numerals I and II.

the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Title 35, Section 271(a) of the United States Code defines patent infringement as follows:

> Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefore, infringes the patent.

35 U.S.C. § 271(a).

The statute at issue, Section 271(e)(1), provides the following exemption:

> It shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

35 U.S.C. § 271(e)(1).

The parties contest the breadth of this exception. Immunomedics argues that "NeoRx's position would eviscerate the safe harbor provided by § 271(e)." Reply II at 1. Immunomedics claims that

> [h]ad Congress intended the exemption of § 271(e)(1) to turn on whether the FDA applicant complied with every detail of FDA law and regulation, it would have said so. It did not. Allowing a patentee, under the guise of an infringement claim, to harass and impede a competitor by oppressive discovery and microscopic examination of its regulatory dealings is the antithesis of the safe harbor Congress intended to create.

Def.Mem. II at 3–4.

For its part, NeoRx contends that Section 271(e)(1)'s scope is "not as broad as Immunomedics would have it." Pltf. Mem. II at 21. NeoRx reiterates the limiting language of Section 271(e)(1)—all infringing acts must be reasonably related to FDA data development and submission. *Id.*

Immunomedics appears to have the better argument. Congress passed Section 271(e)(1) explicitly to overturn the Federal Circuit's decision in *Roche Products, Inc. v. Bolar Pharmaceutical Co.* 733 F.2d 858, *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). In *Roche*, the circuit had strictly interpreted Section 271(a) such that "the unlicensed use of a patented invention for testing and investigation, even though strictly related to obtaining FDA approval for a substitute, was an infringement" under that section. *Eli Lilly and Co. v. Medtronic, Inc.*, 872 F.2d 402, 406 (Fed.Cir. 1989).

Congress' "primary concern was to create a legal environment that would enable new, medically beneficial, cost-competitive products to reach the general market place in meaningful volume just as soon as the undistorted operation of the patent laws would permit." *Intermedics, Inc. v. Ventritex, Inc.*, 775 F.Supp. 1269, 1273 (N.D.Cal.1991), *aff'd* No. 92–1076, 1993 WL 87405, 1993 U.S.App. Lexis 3620 (Fed.Cir. Feb. 22, 1993). "We believe that in enacting this exemption Congress clearly decided that it wanted potential competitors to be able to ready themselves, *fully,* during the life of the patent, to enter the commercial marketplace in a large scale way as soon as the relevant patents expired." *Intermedics,* 775 F.Supp. at 1277; *see also Chartex Int'l PLC v. M.D. Personal Products,* No. 92–1556, 1993 WL 306169, at *2, 3, 1993 U.S.App. LEXIS 20560, at *7, 9 (Fed. Cir. Aug. 12, 1993).

In this regard, the phrase "reasonably related" communicates Congress' "intention that the courts give parties some latitude in making judgments about the nature and extent of the otherwise infringing activities they would engage in as they sought to develop information to satisfy the FDA." *Intermedics,* 775 F.Supp. at 1280. The focus is upon the actual uses of the patented product for the simple reason that the entities seeking patents have a commercial goal in mind. "[I]f a party were to lose the exemption every time a business purpose was detectable in its otherwise infringing activities, the exemption would virtually never be available and thus would fail to achieve

Congress' objective." *Id. But cf. Scripps Clinic & Research Found. v. Genentech, Inc.,* 666 F.Supp. 1379, 1396 (N.D.Cal.1987) (interpreting the statute as immunizing "any use of a patented invention so long as some aspect of that use is reasonably related to FDA testing" would defy "the plain mandate of the statute and the intent of Congress").

Application of Section 271(e)(1) requires a two-step inquiry: (1) whether the activity at issue is a potentially infringing one; and (2) whether the exemption applies to that activity.

NeoRx points to five allegedly infringing uses of their patented product:

1. manufacture of "launch-quantity inventory" of ImmuRAID–CEA;

2. manufacture, use and shipment of the Products to obtain foreign regulatory approval;

3. the Center for Molecular Medicine and Immunology's ["CMMI"] use and shipment of the Products;

4. export of ImmuRAID–CEA to Bender & Co.; and

5. submission of inaccurate or fraudulent data to FDA.

*A. Is Immunomedics' Production of the Product Reasonably Related to the FDA Approval Process?*

■ The FDA "requires that an applicant demonstrate that it is capable of manufacturing commercial scale batches of the product." Def.Mem. II at 26. NeoRx's own expert, Marc Bozeman, concurs with this:

The FDA will not approve an application if the manufacturing facility has not yet been "scaled up" from the product development phase, during which only limited manufacturing capacity is required, to the commercial phase, where the company is ready to product [sic.] large quantities of product for immediate commercial distribution.

Bozeman Sept. 17, 1993 Decl. at ¶ 17.

NeoRx asserts that Immunomedics has manufactured "stockpile commercial quantities" of ImmuRAID–CEA for sale, which it claims is not related to obtaining FDA approval and constitutes a nonexempt infringing act.[3] Pltf.Mem. II at 6, 13. NeoRx states that only two to three lots are necessary to secure FDA approval of scaled-up manufacturing process. Bozeman Third Suppl.Decl. at ¶ 5. According to this, the fourth commercial-scale lot manufactured in August 1993 has exceeded, and those subsequent will exceed, those requirements. Pltf. Mem. II at 6, 24.

The court holds that Immunomedics' production of ImmuRAID–CEA is reasonably related to the FDA approval process. As a preliminary matter, it appears that the FDA was fully aware of Immunomedics' scale-up production plans.[4] Moreover, Immunomedics argues that it has been producing additional commercial-scale lots in case the FDA requests further information. NeoRx counters that if Immunomedics were acting in good faith, it would wait to see if the FDA's questions would require a change in the process before making more material. Pltf. Mem. II at 7. However, the Federal Circuit has found that "it is unforeseeable how much data FDA will require [a company] ... to submit during the approval process." *Intermedics Inc. v. Ventritex Co. Inc.,* 26 U.S.P.Q.2d 1524, 1527, 991 F.2d 808, 1993

3. NeoRx's emphasis on the fact that Immunomedics has produced vials far in excess of its clinical testing needs is not relevant to the court's inquiry. *See* Pltf.Mem. II at 5. The scale-up requirement is not correlated to the amount of material necessary to conduct clinical trials.

4. The minutes of a meeting between the FDA and Immunomedics on November 17, 1992 clearly reflect that Immunomedics' discussed its plans to scale up to a 3,000 to 5,000 vial lot size. Def.Reply Exh. Tab 15 at 4. Also, in its July 21, 1993 manufacturing report, Immunomedics states that the manufacturing process has been scaled up to a 1,000 to 3,000 vial lot size and that it plans a further scale-up to a 5,000 to 10,000 vial lot size. Def.Reply Exh. Tab 16 at I 083513. NeoRx attaches great significance to the fact that this report does not mention the 3,000 to 5,000 vial goal. Pltf.Surreply at 3–5.

The court finds that whether or not Immunomedics abandoned its 3,000 to 5,000 vial goal is immaterial to this dispute as Immunomedics has already informed the FDA that it will continue to scale up to a goal of 5,000 to 10,000 vials, which far exceeds the 3,000 to 5,000 vial lot in size and which implies that many more than three lots will be produced.

WL 87405 (Fed.Cir.1993). Hence, "a prudent applicant cannot know whether the FDA will require more data before the application is granted." *Id.* at 1525 (citing *Intermedics,* 775 F.Supp. at 1282).

The general parameters of Immunomedics' scale-up plans are not in dispute. Rather, the parties have competing interpretations of these parameters. The court concludes that given the uncertainty of the FDA's needs and the FDA's knowledge of the scale-up plans, Immunomedics' production of Immu-RAID–CEA is reasonably related to the development and submission of information for the FDA. *See Intermedics,* 775 F.Supp. at 1281 (the reasonably related standard was designed to give parties some discretion in committing infringing acts that would generate data for FDA applications).

In conclusion, the court grants defendant's summary judgment as to this point.[5]

### B. Do Immunomedics' Efforts to Obtain Foreign Regulatory Approval Constitute Nonexempt Infringing Acts?

Immunomedics has initiated clinical tests with patients in the United States and overseas and has submitted applications for foreign regulatory approval. According to Dr. Pinsky, Immunomedics' Vice President of Medical Affairs, the primary purpose for testing abroad was to "get as wide an experience with these products" as possible for their FDA filings. Def.Exh. Tab 6 at 202–04. Immunomedics also ran clinical trials overseas with an eye towards obtaining regulatory approval in those countries. *Id.* This commercial motivation does not necessarily deprive defendant of the Section 271(e)(1) exemption. *See Intermedics,* 775 F.Supp. at 1280 ("if a party were to lose the exemption every time a business purpose was detectable in its otherwise infringing activities, the exemption would virtually never be available

and thus would fail to achieve Congress' objective").

### 1. Shipments of the Products to Foreign Regulatory Agencies

■ Immunomedics shipped samples of its Products to the Committee for Proprietary Medicinal Products ["CPMP"] of the European Community; Hong Kong; and Canada for approval to market and sell them in those countries. NeoRx submits that those shipments are unrelated to the FDA's requirements and are outside the Section 271(e) exemption. The court agrees with plaintiff that making the Products in the United States then shipping them abroad to regulatory agencies is not reasonably related to the submission of data to the FDA and as such is a nonexempt infringing activity.

Immunomedics argues that such shipments are not potentially infringing activities under Section 271(a) and cites to *Chartex Int'l, PLC v. M.D. Personal Products Corp.* to support its argument that the manufacture is not infringing:

> Plaintiff argues that the *making* of devices for use at trade shows is outside of the exemption, because such activities were not "solely for uses reasonably related" to generating data for submission to the FDA. However, the evidence shows that the devices were manufactured for FDA trials. Magistrate Judge Brazil faced the same issue in *Intermedics,* and held that:
>
>> where it is undisputed that most of the [devices] have been used to generate data for the FDA, the fact of manufacture, by itself, does not deprive defendants of the statutory exemption.

*Chartex,* No. C–90–3622–CAL, slip op. at 6–7 (N.D.Ca. Aug. 19, 1992), *aff'd,* No. 92–1556, 1993 WL 306169, 1993 U.S.App. LEXIS 20560 (Fed.Cir. Aug. 12, 1993) (quoting *Intermedics,* 775 F.Supp. at 1282).[6]

---

5. The court need not, and does not, reach Immunomedics' argument based upon NeoRx's FDA application process.

6. Defendant cites to the Federal Circuit's decision in *Chartex* for another argument in support of its position:

    Making arrangements to have a device manufactured overseas or making arrangements to

have it imported into a foreign country is neither an infringing "making," "using," or "selling" of the invention within the United States. *Chartex,* No. 92–1556, 1993 WL 306169, *3, 1993 U.S.App. LEXIS 20560, *10 (Fed.Cir. Aug. 12, 1993). However, the *Chartex* court was referring to preparations to have a product made or imported overseas, which are distinguishable from

In a similar vein, Immunomedics argues that NeoRx cannot claim that the making was infringing where the manufacture of the lot from which the CPMP vials came was reasonably related to Immunomedics' FDA application (since the "vast majority" of vials were used in clinical trials). Reply II at 18. Immunomedics then asserts that shipments to overseas regulatory agencies is protected since any use of the Products outside the United States is not infringing and, moreover, there is no evidence that those agencies used the vials. Immunomedics adds that it informed the FDA in its September 1992 Annual Report that it filed applications with the CPMP and Canada. Def.Reply Exh. Tab 33 at I 013413.

It may be true that most of the vials were used to generate data for the FDA, but in this instance, some vials were clearly used for other purposes. This presents a different scenario from that in *Chartex* and *Intermedics*. Both courts held that manufacture *by itself* is exempted if most of the devices were used to generate data for the FDA. Here, Immunomedics manufactured the vials then sent some to foreign regulatory agencies. Immunomedics argues that those vials were a de minimis infringement. Using a patented product to seek access to foreign markets is arguably not a de minimis act of patent infringement. *See Scripps*, 666 F.Supp. at 1396 (uses of the product "serving multiple purposes unrelated to meeting FDA requirements," including the "preparation of Genentech's application for a European patent," are beyond the protection of Section 271(e)(1)).

### 2. Submission of Data for Foreign Regulatory Approval

NeoRx claims that "[m]aking, exporting, and using Accused Products to gain foreign regulatory approval is not related to developing data for the FDA." Pltf. Mem. II at 27 (citation omitted). It implies that since Immunomedics submitted data from its foreign clinical trials to the CPMP, this act falls outside the Section 271(e)(1) exemption.

NeoRx cites to Exhibit 116 which is a study of 16 patients.

Immunomedics asserts that all of the foreign clinical data submitted to the CPMP on March 1992 for a European Product Marketing Authorization was first submitted to the FDA. Reply II at 11–12. Immunomedics points out that the 16–patient study had first been submitted to the FDA, nearly a year earlier, as part of its April 1991 PLA. Where data is first submitted to the FDA, subsequent use of the same data is not an infringing act:

> The statute at issue here [Section 271(e)] only requires that the making, using or selling of the patented invention be solely for uses reasonably related to FDA approval. To adopt Telectronics' interpretation we would have to read into this statute an unspoken requirement that the disclosure of information obtained during clinical trials to persons other than FDA officials, although not itself an act of infringement, somehow "repeals" the exemption. We do not find that requirement in the words of the statute.

*Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1524 (Fed.Cir.1992). The *Intermedics* court held that "defendants' use of clinical data to support foreign import applications ... are not otherwise infringing acts under § 271(a). And, like raising capital, these activities are important means for Ventritex to position itself to enter the market place if the Cadence ever receives FDA approval." *Intermedics*, 775 F.Supp. at 1281.

### 3. Shipments to Drs. Becker and Baum

NeoRx contends that some vials shipped to two foreign clinical investigators, Drs. Becker and Baum, violated FDA regulations since they allegedly had not been properly identified to the FDA and their trials allegedly did not follow an FDA-approved protocol. As such, NeoRx claims that the shipment is not reasonably related to obtaining FDA approval. Pltf.Mem. II at 29.

NeoRx's expert, Dr. Bozeman, reports a telephone conversation with Dr. Baum in

---

making a product in the United States then sending it abroad. The act of making a patented product in the United States is patent infringement under Section 271(a) unless otherwise exempted.

which Dr. Baum allegedly stated that "it had never been his understanding that the results of these studies were intended for subsequent submission to the FDA, but rather that they were intended for use in securing approval of the products by the German regulatory authorities." Bozeman Third Supp. Decl. at ¶ 13. Dr. Baum allegedly went on to state that "his studies were never intended to comply with those [FDA-approved protocol] requirements." *Id.*

As to Dr. Baum's alleged statements to Dr. Bozeman, Dr. Pinsky had sent Dr. Baum copies of the protocols followed in Immunomedics' clinical trials in the United States. Def.Reply Exh. Tab 41. Dr. Baum had also signed a 1572 [Statement of Investigator] form [7] on August 30, 1990 for CEA clinical trials. That form identified his studies by Investigational New Drug protocol number. Def.Reply Exh. Tab 42. Immunomedics appears to argue by implication that Dr. Baum must have been aware that his studies were for an FDA application and that he understood that he was to follow the protocol.[8] *See also* Def.Reply Exh. Tabs 46–47 (Dr. Baum complying with Immunomedics' request for patient list for an FDA report).

Whether Dr. Baum knew that his data was for submission to the FDA or not is irrelevant to the issue of the actual use of his clinical work. Immunomedics concedes that these shipments may not have been entirely in accordance with FDA requirements, but denies that these were material violations for purposes of the Section 271(e)(1) exemption. Immunomedics argues that it has complied with FDA requirements that corrective measures be taken if a potential violation is found. Def.Mem. II at 11. At his deposition, Dr. Pinsky claimed that Immunomedics has provided the FDA with all of Dr. Baum's information concerning his CEA injections in its 1992 Annual Report to the FDA on colorectal CEA, but Immunomedics has not provide an excerpt from this Annual Report verifying his statement.

The court concludes that the lack of a clear indication that Dr. Baum's work was submitted, or to be submitted, to the FDA argues in favor of a determination that his studies were not reasonably related to FDA submission.

As to Dr. Becker, the court finds that the documentation supports Immunomedics' position that his work was reasonably related to its FDA application. Immunomedics claims that it has identified Dr. Becker to the FDA and states its intent to submit all information from him to the FDA. Def.Exh. Tab 10 at 76–77. In a letter dated February 26, 1991, Dr. Pinsky acknowledges Dr. Becker's "desire to participate in the clinical trials" of ImmuRAID–MN3 and gives Dr. Becker preliminary information to initiate clinical trials, including an FDA 1572 form and informs him that the "submission [of several documents] to the U.S. FDA must be made before we can ship the antibody material." Def.Reply Exh. Tab 38. A September 20, 1991 letter to Dr. Becker notes that Immunomedics is "in the process of preparing the documentation which will be submitted" to the FDA "in support of your IMMU–MN3 clinical trial." Def.Reply Exh. Tab 39. Immunomedics sent him two more follow up letters requesting certain documents for submission to the FDA. *Id.* Dr. Becker signed the 1572 form in late 1991. Def.Reply to Surreply Exh. Tab 63.

Hence, the court grants defendant summary judgment as to the issues of submitting data for foreign regulatory approval and Dr. Becker's studies, but not as to shipment of samples to foreign regulatory agencies and Dr. Baum's work.

## C. Are the Center for Molecular Medicine and Immunology's Use of the Products Unrelated to FDA Approval?

The Center for Molecular Medicine and Immunology ["CMMI"] is a non-profit research organization that is headed by Dr. Goldenberg, founder of Immunomedics and

---

**7.** A 1572 form states that the investigator will comply with various FDA regulations. *See* Def. Exh. Tab 34.

**8.** Immunomedics eventually stopped shipments to Dr. Baum. Immunomedics states that it dis-

continued its relationship with him when he did not provide necessary documentation for submission to the FDA despite repeated requests from the company. Def.Exh. Tab 6 at 161.

current Chairman of Immunomedics Board of Directors. Dr. Pinsky, Immunomedics' Vice President for Medical Affairs, is an adjunct member of CMMI. Immunomedics transferred vials of the Products to CMMI which has injected patients for research studies which NeoRx claims were not FDA approved and hence are not reasonably related to submission of data to the FDA. In addition, NeoRx claims that transfers of vials to certain foreign researchers were nonexempt infringing activities. Pltf.Mem. II at 9–10.

Immunomedics states that "the record establishes that CMMI collaborates with Immunomedics on CMMI's research involving Immunomedics' products, and that Immunomedics had access to all of CMMI's data for submission to the FDA." Reply at 11. Particularly in light of this open relationship, Dr. Goldenberg's leadership of both organizations, and Dr. Pinsky's membership in both, the court concludes that NeoRx, the non-moving party, has not "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56.[9]

The court holds that NeoRx's numerous arguments regarding CMMI's clinical work expose de minimis acts of infringement, which do not seriously threaten the purposes behind Section 271(e). First, it alleges that CMMI began testing upon humans before receiving FDA authorization. Under applicable FDA and New Jersey Department of Health policies, a FDA Investigational New Drug application ["IND"] is required before any unapproved drug can be injected into humans, whenever that drug is prepared from or packaged with materials obtained from interstate commerce. Pltf.Mem. II at 10 & n. 7. Immunomedics allegedly transferred 227 of 247 vials to CMMI prior to the filing of the IND for ImmuRAID–CEA. Pltf. Mem. II at 10 n. 7.

Immunomedics responds that the FDA had approved CMMI's pre-IND study research and cites to the cover letter, dated April 12, 1991, submitted to the FDA with Immunomedics' PLA filing:

> Since ... [CMMI] had received IRB [Investigatory Research Board] approval for investigation of this radiolabeled fragment, it was agreed that a dose study could proceed *prior* to submission of the new IND (3162), *which was filed March 20, 1989.*

Reply at 9 (quoting from Def.Exh. Tab 19) (emphasis added).

According to NeoRx's expert, Dr. Bozeman, the FDA will exclude data from a non-IND study in approving a new drug. Pltf. Mem. II at 11. Yet, in one particular report submitted as part of its April 1991 Product License Application ["PLA"], the clinical investigators report that

> This study was conducted at [CMMI] ... under a protocol approved by the University Hospital Institutional Review Board. The study was not formally registered as part of Immunomedics IND # 3162....
>
> (This was not an officially IND-registered study, but *with the conconcurrence [sic.] of the FDA* (Nov. 6, 1990), these patients are included in this submission to provide specific types of data not available from the IND studies.)

Def.Reply Exh. Tab 25 at I 016423, I 016417 (emphasis added). Immunomedics had also included other documents which are clearly labeled, "Non–IND Study CMMI." Def.Reply Exh. Tab 24 at I 015307, 015309. Hence, despite the opinion of Dr. Bozeman as to the FDA's usual practice, the FDA agreed to consider the non-IND report in the April 1991 PLA filing. *See* Bozeman Third Supp. Decl. at ¶ 18. Immunomedics cites to other instances in which, over the past several years, it either discussed with or submitted to the FDA aspects of CMMI's work, some identified as "Non–IND" work. Reply II at 10; Def.Reply Exh. Tab 20 at I 012334 (March 20, 1989 IND); Tab 22 at I 010965 (October 1990 letter to FDA); Tab 23 at I 011141 (minutes of November 1990 meeting with FDA).

---

9. Immunomedics also notes that other CMMI research on the products will be submitted in support of Immunomedics' FDA applications ad-

dressing lung cancer, breast cancer, and lymphoma.

NeoRx alleges that CMMI used the vials to further its own research aims and not to generate data for the FDA, although NeoRx gives no indication of the nature of these independent research goals. Pltf.Mem. II at 11. NeoRx also makes much of the fact that Immunomedics submitted only some of CMMI's data developed in its non-IND studies of the Products. It characterizes this as a "post-hoc (and selective) submission of data [which] cannot retroactively cloak all of CMMI's activities with the Section 271(e)(1) exemption, particularly when the non-IND data actually submitted to the FDA will *not* be relied upon to approve the proposed drug." Pltf.Mem. II at 12–13.

NeoRx also submits a document which indicates that Immunomedics gave Dr. Goldenberg at least 25 vials, and argues that the company lacked the proper FDA authority to do so. Pltf.Mem. II at 13; Pltf.Ex. 160 at I 015163. NeoRx contends that Dr. Goldenberg was not an authorized investigator under any IND, and any data which may have been generated from the vials has not been sent to the FDA. Pltf. Mem. II at 13. Although Immunomedics does not respond to this argument, the court finds that this is at worst a de minimis act of infringment, which does not bring CMMI's activities outside the pale of Section 271(e).

In conclusion, the court grants defendant's summary judgment as to CMMI's research activities.

### D. Does Immunomedics Manufacture and Export of the Products to Bender & Co. Constitute a Nonexempt Infringing Activity?

██ NeoRx claims that to induce Bender & Co. ["Bender"], a commercial distributor in Austria, to agree to market ImmuRAID–CEA, Immunomedics and CMMI sent it approximately 135 vials of ImmuRAID–CEA and MN3 antibodies over almost three years. According to NeoRx's expert, these shipments to a potential commercial partner, who allegedly never considered conducting trials for FDA purposes, are not reasonably relat-ed to the FDA approval process. Pltf.Mem. II at 14.

In reply, Immunomedics argues that "NeoRx grossly misstates the record." Reply II at 13. As part of discussions on a commercial distribution agreement, Immunomedics claims that it agreed to have Bender conduct clinical tests which it would submit to the FDA. Immunomedics' expert, Dr. Parkman, testified that the FDA would not find this arrangement improper, but the March 9, 1990 letter to Bender merely mentions that Immunomedics "will have access to the clinical evaluation data and process and assist Bender with patient selection criteria." Def.Reply Exh. Tab 31 at I 024119. On its face, the letter emphasizes the potential that the Products may win approval in Europe and that Bender, who would supervise the European clinical trials, would be the distributor. *Id.* at I 024118.

This is not inconsistent with running trials in Europe for the main purpose of collecting data for submission to the FDA. The Federal Circuit acknowledges the controlling hand of financial considerations in research and development of new medical products:

> It would strain credulity to imagine that Congress was indifferent to the economics of developing and marketing drugs and medical devices when it enacted § 271(e)(1).... Congress must have intended to allow competitors to be in a position to market their products as soon as it was legally permissible.

*Telectronics,* 982 F.2d at 1525. Thus, the fact that running trials through Bender's auspices would generate data for the FDA process as well as facilitate approval in the European market does not necessarily defeat Immunomedics' claim to the Section 271(e)(1) exemption. The court now turns to a consideration of the European clinical trials run with vials obtained from Bender.

Immunomedics states that Dr. Lind is Bender's clinical investigator for ImmuRAID–CEA and that it provided him with a FDA 1572 form, which it submitted to the FDA on August 29, 1990.[10] Reply II at 14.

---

**10.** NeoRx claims that Dr. Lind had not signed the 1572 form; however, defendant has included a copy of the signed form among its exhibits to

In a letter dated August 8, 1990, Dr. Lind promises to Dr. Pinsky that he will "strictly follow the protocol." [11] Reply Exh. Tab 35. Dr. Lechner, a fellow researcher, signed a 1572 form on January 12, 1992, which NeoRx indicates came after most of the vials had been shipped to Bender. Reply II at 15. Although NeoRx claims that there is no evidence that Bender ever considered conducting trials for FDA purposes, Immunomedics did submit Drs. Lind and Lechner's work to the FDA,[12] pursued FDA-mandated documents such as the 1572 form, and secured the consent of Dr. Lind to follow Immunomedics' protocol.[13]

Immunomedics rebuts NeoRx's argument that Immunomedics cannot account for 73 of 135 vials which Immunomedics and CMMI allegedly sent to Bender. NeoRx contends that these are 73 vials that may not have been used to generate data for the FDA. NeoRx also states that CMMI sent some vials to Drs. Lind and Lechner.[14] Pltf.Mem. II at 11–12. Immunomedics points out that there is no record that it filled one 40–vial order from Bender,[15] and Immunomedics can account for the other 95 to 98 vials of NeoRx's 135 vial calculation.[16] Def.Reply Exh. Tab 33 at I 13349; Pltf. "I docs" at I 063012.

NeoRx further argues that Bender sold some of these vials to Drs. Lind and Lechner and possibly other researchers. The sale of the Products to Drs. Lind and Lechner is exempt since the clinical trials were designed to generate data for the FDA application. NeoRx also points out that Immunomedics' expert, Dr. Parkman, stated that CMMI's shipment of Products to Bender was inconsistent with "several important FDA regulations." Pltf.Mem. II at 15. This is a misleading statement. First, Dr. Parkman testifies that he is not an expert as to this issue. Second, the questions put to Dr. Parkman mistakenly assume that there is no way in which a commercial distributor could contribute to clinical trial work. Pltf.Exh. Parkman at 233, 313–16, 343–44.[17]

NeoRx also mischaracterizes Immunomedics statement to the FDA that it did not "currently intend to include this cohort of patients [Dr. Lind's] in our pivotal Phase III studies." Pltf. "I docs" at I 003485. NeoRx states that Immunomedics "told the FDA that it would not rely on the study for FDA approval." Pltf.Mem. II at 15. This is at best a crude representation of Immunomedics' statement to the FDA. The fact that Immunomedics elected not to submit data from a clinical trial does not dispose of a claim to the Section 271(e)(1) exemption. "[W]e do not believe that Congress intended a party to lose the exemption simply because it turns out, after the fact, that some of that party's otherwise infringing 'uses' either failed to generate information in which the

its reply to NeoRx's supplemental surreply. Def.Reply to Supp.Surreply Exh. Tab 60.

11. The fact that Immunomedics provided them with the protocol before he embarked on the study deflates NeoRx's claims that Drs. Lind and Lechner began their clinical trials long before Dr. Goldenberg obtained a protocol. NeoRx had stated that the allegedly tardy protocol was further proof that Drs. Lind and Lechner were not researching in order to submit data to the FDA.

12. For example, Immunomedics submitted their 16–patient study to the FDA as part of its April 1991 PLA.

13. Immunomedics also notes that the protocol outlining the procedures which Bender would be required to follow in its tests, is labeled a Phase III trial for IND No. BB–3162, an Immunomedics FDA application. Parkman Aff., Def.Exh. Tab 9a. However, this does not necessarily mean that the research was in support of an IND application.

14. NeoRx argues that this is further proof that CMMI's studies were not done for the FDA application and thus are not nonexempt infringing acts.

15. NeoRx's count includes a 40–vial request in December 1991, but there is no record of shipment from Immunomedics nor does the log sheets for the CEA batches available at the time reflect any such shipment to Bender. Pltf.Exh. A at I 062790, Ex. 159.

16. According to Dr. Lind's manuscript, 68 full-vial injections were made to 47 patients, as opposed to NeoRx's assertion of only 47 injections. Reply Exh. Tab 33. Dr. Lechner stated that he injected 15 vials and that Bender had an additional 12 to 15 vials.

17. Immunomedics itself did not respond to these particular points.

FDA was interested or generated more information than turned out to be necessary to secure FDA approval." *Intermedics,* 775 F.Supp. at 1280.

### E. Did Immunomedics Submit Fraudulent Data in its FDA Filings?

■ NeoRx claims that Immunomedics submitted fraudulent data to the FDA, which is not reasonably related to the development of data for the FDA and thus disqualifies Immunomedics for a Section 271(e) exemption.

First, NeoRx argues that the patient case report forms ["CRFs"] prepared by Immunomedics' many outside clinical investigators contain significantly "inaccurate" or "discrepant" data. Second, NeoRx claims that Immunomedics sought to cover up these discrepancies with the aid of BRI and the clinical investigators. NeoRx's contention is based upon a single document: a January 14, 1992 document prepared by Immunomedics' employees ["PX 90"]. Bozzo Aff. at Exh. C. PX 90 proposes a three-step process to resolve the "many discrepancies ... between the 'archived' Case Report Forms at Immunomedics and those filed at BRI [Biomedical Research International Inc., an independent consultant], on which the PLA is based ... [and the] current copies of Case Report Forms in the investigators' files [which] may well be different from those both at Immunomedics and BRI." *Id.*

NeoRx emphasizes the employees' statement that "[t]his disagreement between Case Report Form ["CRF"] copies poses a serious risk to the company should FDA discover these discrepancies during an audit of either Immunomedics or the clinical sites." *Id.* In fact, one of NeoRx's expert states that the "mere existence" of Px. 90 is "sufficient to question whether Immunomedics' data gen-

eration and submission is above board." Pltf.Mem. II at 34 (quoting Bozzo Decl. at ¶ 22); Surreply at 8.

NeoRx's expert also criticizes the "action plan ... [as] not an appropriate manner to assure data accuracy." Bozzo Aff. at 24. In Step I, BRI was to make a set of copies of all PLA documents for Immunomedics' archives and for each investigator. In Step II, the discrepancies among the three sets of CRFs were to be resolved at the clinical sites.

The court agrees with defendant that Bozzo misconstrued Step I. He understood Step I to require making "all CRFs ... consistent with those at BRI." *Id.* However, the plain language of Step I merely requires that BRI send copies to Immunomedics and the investigators of the documents submitted to the FDA for a Product License Application.[18] In any event, defendant states that BRI never followed through with Step I. Pinsky Aff., Def.Reply Exh. Tab 6a at 316–17. Furthermore, finding Immunomedics' methodology lacking is not the same as declaring that it committed fraud.

The court concludes that the evidence submitted is not legally sufficient to support a finding of fraud or fraudulent intent. PX 90 does not clearly indicate an intent or plan to defraud the FDA. To the contrary, PX 90 calls for BRI employees to compare the CRFs of Immunomedics, the investigators, and BRI and to document "at the investigational site" any differences among them. Furthermore, "[a]ll corrections and modifications will be properly signed and dated." *Id.* Immunomedics also states that it provided the FDA with the "very documents (namely the up-to-date audited CRFs and the corresponding source documents) which NeoRx says Immunomedics conspired to hide from the FDA."[19] Reply II at 24.

---

18. In addition, defendant provides an excerpt of Dr. Carl Pinsky's deposition which indicates that BRI never carried through with Step I.

19. Immunomedics refers the court to a truncated excerpt from Pinsky's deposition transcript. A longer excerpt would have provided welcome context. Pinsky's statements indicate that the FDA had been given documents which flagged changes made in the PLA data. Def.Reply Exh.

at Tab 6a, 629–30. The following is from Pinsky's deposition:

Q: Now, in those 210 patients, if there were changes on the reading of the scan from the original PLA submission to June of '93, that change would not have been pointed out to the FDA. Correct?

A [Pinsky]: Well, except it would be obvious on the pages 6 and 7 from the PLA patients....

Def.Reply Exh. Tab 6a at 630.

The court grants Immunomedics' motion for summary judgment upon the fraud claim.

## II.  NeoRx's Declaratory Judgment Motion

NeoRx seeks a declaratory judgment of patent infringement pursuant to the Declaratory Judgment Act.  28 U.S.C. § 2201.  Rendering a declaratory judgment is a discretionary matter for a federal court.  The prerequisite to a declaratory judgment is that the parties must have an actual case or controversy and the declaration must substantially resolve the parties' dispute.

■ In a patent infringement suit, two elements must be shown to satisfy the actual controversy requirement.  First, the defendant must be making meaningful preparation for infringing activity.  This has been formulated into an inquiry into whether the alleged infringer has the requisite "ability and definite intention to undertake a potentially infringing activity." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed.Cir.1988).  Second, acts of the "defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming." *Lang v. Pacific Marine and Supply Co.*, 895 F.2d 761, 764 (Fed.Cir.1990).  However, in *Lang*, the court held that plaintiff had failed to meet the actual controversy requirement since the "accused infringing ship's hull would not be finished until at least 9 months after the complaint was filed.  *Cf. Arrowhead*, 846 F.2d at 734 n. 2 (explaining that the propriety of the dismissal 'must be determined on the facts existing at the time the complaint under consideration was filed')." *Lang*, 895 F.2d at 764; *see also Intermedics*, No. 92–1076, 1993 WL 87405 at *3, 1993 U.S.App. LEXIS 3620 at *11 ("Intermedics must have shown a ' "sufficient allegation of immediacy and reality" [at the time it filed its complaint in 1991] to meet the actual controversy requirement for a declaratory judgment suit.' " (citations omitted)).

■ NeoRx claims that "Immunomedics' acts summarized above establish its present ability and intent to infringe" and that it "has refused to change its course of action and has accelerated its manufacture of Accused Prod-

ucts to stockpile an inventory for commercial sales." Pltf.Mem. II at 38.

In its one-paragraph response, Immunomedics states that making a declaratory judgment would "undercut" the Section 271(e) exemption. Reply II at 28 (citing *Intermedics*, No. 92–1076, 1993 WL 87405, at *4–5, 1993 U.S.App. LEXIS 3620, at *15; *Intermedics*, 775 F.Supp. at 1290).

Even if this court were to grant NeoRx's request for leave to file a Second Amended Complaint, NeoRx has failed to make a "sufficient allegation of immediacy and reality" in this action. *Id.* It is unclear when the FDA will grant Immunomedics' application for a license to manufacture ImmuRAID–CEA commercially.

NeoRx claims that this test applied even where infringing acts are exempt under Section 271(e)(1) and cites to *Telectronics*, 982 F.2d 1520.  However, the *Telectronics* court affirmed the district court's grant of summary judgment to the defendant on the declaratory judgment counts.  Similar to this case, Telectronics, the patent holder, claimed that "a justiciable controversy existed because Ventritex's device was being used clinically and was unlikely to be modified further before FDA approval." *Id.* at 1526.  As Ventritex argued in the district court, "the future infringement issue was not ripe for adjudication because (1) its device may never be approved, and (2) even if approved, it may not be approved in its current state, because it is not uncommon for devices to be modified during the course of clinical testing." *Id.* These arguments are equally available here.

In conclusion, the court denies NeoRx's motion for declaratory judgment.  The court grants defendant summary judgment as to the following issues: the scale-up manufacture of ImmuRAID–CEA, submission of data to foreign regulatory agencies, Dr. Becker's clinical work, CMMI's use and shipment of the Products, shipment of Products to Bender, and the fraud claim.  The court denies summary judgment as to shipment of samples of the Products to foreign regulatory bodies and Dr. Baum's work.